**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**MARK MULLER**                                                                        **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO: 1:17-cv-00339-LG-RHW**

**MISSISSIPPI POWER COMPANY,**
**HARDY WHEELESS, CHARLES E.**
**SMITH, and JOHN/JANE DOES 1-10**                                    **DEFENDANTS**


**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, Mississippi Power Company ("MPC"), and submits this Memorandum of Law in Support of Motion for Summary Judgment.  In addition to this Memorandum, Defendant relies on its Motion for Summary Judgment and the exhibits thereto.

**I.**        **INTRODUCTION**

Plaintiff Mark Muller was employed by MPC as an Operations Team Leader at Plant Daniel in Moss Point, Mississippi.  Mr. Muller was previously an Operations Team Leader at Plant Watson in Gulfport, Mississippi, but was transferred to Plant Daniel in November 2016 as a result of a restructuring at Plant Watson.

Plaintiff was terminated on July 28, 2017, after he admittedly breached confidentiality and then engaged in unacceptable behaviors in response to MPC's attempt to administer discipline for the breach.

Plaintiff filed an EEOC charge alleging that he had been terminated after he complained of unfair treatment of two female employees and submitted pages of information purporting to support his allegations.  The EEOC issued a Dismissal and Notice of Rights without ever notifying MPC that a charge had been filed or requesting information from MPC based on the EEOC's determination that Plaintiff could not establish a prima facie claim to which MPC

263486.2

should be required to respond.  Plaintiff subsequently filed the instant lawsuit alleging age discrimination and retaliation against MPC and intentional infliction of emotional distress against his supervisor, Operations Manager Mr. Hardy Wheeless, and Mr. Charles ("Skipper") Smith, a co-worker.  Plaintiff agreed to dismiss Mr. Wheeless and Mr. Smith and the intentional infliction of emotional distress claim from this action.  [Doc. 86]. The remaining claims of age discrimination and retaliation are without merit and this case should be dismissed in its entirety.

## II.   UNDISPUTED FACTS

As shown below, summary judgment should be granted in this case because Plaintiff either cannot establish the prima facie elements of his claims and/or cannot overcome MPC's legitimate, non-discriminatory reasons for the challenged employment actions.

### A.   Plaintiff's Employment at MPC

MPC generates and distributes electricity to approximately 188,000 customers across its service area.  Ex. B at ¶ 2.  Due to the inherently dangerous nature of its business, safety is of paramount importance at MPC.  Ex. B at ¶¶ 2, 3; Ex. H at 41.  In addition to the typical employment policies such as no discrimination, no harassment, no retaliation, and compliance with work rules, MPC employees are expected to comply with other policies such as Our Values (formerly known as Southern Style)[1] and the Code of Ethics.  Ex. B at ¶ 3.  Our Values/Southern Style is defined as behavior that demonstrates safety first, unquestionable trust, superior performance, and total commitment.  Ex. B at ¶ 3.

Plaintiff Mark Muller was hired by MPC in June 1982 as a helper at Plant Watson in Gulfport, Mississippi.  Ex. A at Ex. 6 (MPC000205-07).  Over time, he progressed through several classifications until he became an Operations Team Leader in July 2010.  Ex. A at Ex. 6

---

[1] In late 2016, Southern Style became known as Our Values and safety was added as core behavioral expectation.  Ex. B at ¶ 3.  Many employees still refer to Southern Style, as is the case in this lawsuit.  Ex. B at ¶ 3.

(MPC000205-07).   Throughout his career, Plaintiff received a substantial amount of training, including classes on leadership, inclusion, human resources for supervisors, creating a culture of trust, and similar topics which relate to leadership skills and the management of employees.   Ex. A at 61-65 and Ex. 6 thereto at MPC000111-123.   Although Plaintiff's performance was routinely rated as meeting expectations, his supervisor noted that "Mark should continue to work on listening to others point of view and responding SLOWLY" in his 2014 Performance Plan and Summary ("PPS").   Ex. A at Ex. 6 (MPC0000150-160 at MPC000158).

In 2015 and 2016, Plant Watson was restructured and two Operations Team Leader positions were eliminated.   Ex. A at 47-49.   Plaintiff and other potentially affected employees were asked to list positions in which they were interested in order of preference.   Ex. A at 47-48; Ex. D at MPC000069-70.   Plaintiff indicated that his first choice was to remain at Plant Watson. His second choice was to be transferred to Plant Daniel in Moss Point, Mississippi.   Ex. D at MPC000069-70.   Mr. Muller and a co-worker were transferred to Plant Daniel and began site-specific training for the Operations Team Leader position which they would assume.   Ex. A at 49, 57-59.

**B.      Plaintiff's Role as Operations Team Leader at Plant Daniel**

Following the Plant Daniel specific training period, Plaintiff assumed responsibility for E Crew sometime in late March or April 2017.   Ex. A at 58-59.   This crew consisted of approximately eight employees, two of whom were Preshia Cumbest and Wendy Fayard.   Ex. A at 73.   Upon assuming responsibility for E Crew, several employees - both male and female - reported to Plaintiff that they did not trust Skipper Smith, another Operations Team Leader.   Ex. A at 68-72.

3

Although Plaintiff was aware of MPC's Compliance and Harassment Free Workplace policies, which require reporting of unlawful behavior such as gender discrimination, Plaintiff did not report any alleged unlawful behavior at this time.[2]  Ex. A at 67-68; Ex. C at Ex. 1. Indeed it wasn't until after Plaintiff breached confidentiality regarding the pre-consistency meeting and his initial discipline was administered did he ever raise any issue about Skipper Smith or Hardy Wheeless.

All employees are also required to complete a Corporate Compliance Questionnaire every year, the first question of which is "In [year], were you intimidated, harassed or discriminated against based on race, color, religion, sex, national origin, age, disability, veteran status, genetic information, sexual orientation or gender identity or expression?"[3] Ex. D at MPC000620-23; Ex. E at 26.  The last question asks, "Are you aware of any employee, contractor or agent who, in connection with their work for the Company, violated the Company's ethical standards, Company policies, laws and regulations or committed fraud?"  Ex. D at MPC000620-23.  Ms. Fayard responded in the negative for each of these questions in 2014, 2015, 2016, and 2017.  Ex. D at MPC000596-611.  Ms. Preshia Cumbest likewise responded in the negative for 2015, 2016, and 2017.  Ex. D at MPC000644-55.  Plaintiff denied being aware of any such behavior during his tenure at Plant Daniel as well.  Ex. D at MPC000620-23. Neither Ms. Fayard nor Ms. Cumbest ever filed a grievance or concern regarding their treatment by Mr. Wheeless or Mr. Smith.  Ex.  G at 52; Ex. L at 91-92, 96.

### C.      Events Leading up to Plaintiff's Termination

#### 1.      June 2017 Pre-Consistency Meeting

---

[2] MPC's policies provide multiple avenues for reporting and prohibit retaliation against anyone who reports potential violations of the policies.  Ex. I at Ex. 4 thereto.  MPC's witnesses recognize the importance of these policies and follow them.  Ex. H at 33-34, 46-47; Ex. C at 30-32; Ex. E at 64-72; Ex. F at 54-59.

[3] The wording of the question was slightly different in 2014.  Ex. D at  MPC000596-99.

MPC employees are evaluated twice yearly.  Before the ratings are finalized, a plant-wide consistency meeting is held with the managers from the various departments where each employee is discussed to ensure, to the greatest extent possible, that all employees are being evaluated using the same standards.  Ex. C at 72-73, 75; Ex. F at 61-62.  Generally, employees who will be rated as anything other than fully meeting expectations will be discussed in more detail.  Ex. C at 72-73, 75.

Departmental meetings known as pre-consistency meetings are held prior to the plant-wide meeting during which the supervisors discuss the ratings for their employees.  Ex. C at 72-73, 83-84.  The discussions that occur in these meetings are kept confidential.  Ex. A at 133; Ex. C at 79-80.  If a supervisor has noticed a performance deficiency in an employee on another supervisor's crew, the two supervisors frequently discuss the issue prior to the pre-consistency meeting, although there is no policy requiring they do so.  Ex. A at 96; Ex. C at 160.

On or about June 22, 2017, a pre-consistency meeting was held to discuss the mid-year ratings for the Operations department.  Ex. A at 89-90.  During that meeting, Skipper Smith asked Plaintiff whether Preshia Cumbest had performed a walk down for him.[4]  Ex. A at 90; Ex. F at 79.  Mr. Smith asked Plaintiff this question because he observed what he perceived to be a potential performance issue with Ms. Cumbest when she had worked on his shift a few days prior to the meeting.[5]  Ex. F at 79-80; Ex. C at 87-89.  Plaintiff replied that he had not and had not noticed any performance deficiencies on the part of Ms. Cumbest.  Ex. C at 94.  During the

---

[4] A walk down is an assessment of an employee's skills and abilities during which the employee demonstrates his or her ability to perform all of the functions of their position.  Walk downs are usually performed when an employee is being evaluated to determine whether he or she is ready to advance to the next position within the progression and may take up to two days to complete.  Ex. H at 14; Ex. C at 96.

[5] Ms. Cumbest also testified about this incident while working on Mr. Smith's crew and stated, "There was some concern around me not being able to unplug a pyrite chute…and maybe there was some concern about me not being able to perform the job because . . . I was there, but somebody else had a hand helping get it done."  Ex. G at 50-51.

brief discussion that followed, other supervisors expressed similar concerns.[6]  Ex. C at 90, 92-93;

Ex. F at 83-84.   Mr. Wheeless, who was running the meeting, suggested that Ms. Cumbest

perform a limited walk down in order to determine whether she was capable of safely performing

her job.[7]  Ex. C at 93, 95.   Although not typical, Mr. Wheeless is aware of other instances in

which employees were asked to perform a walk down outside of the context of promotions.   Ex.

C at 102.    As Mr. Budney, Plant Manager, explained, "they're used for promotions or

evaluations where training needs are . . . ."  Ex. H at 14.

### 2.      Plaintiff Breaches Confidentiality of Pre-Consistency Meeting

Following the meeting, Plaintiff informed Ms. Cumbest that her capabilities had been

questioned and that she was going to perform a walk down.   Plaintiff admits that he "shared the

details of the confidential consistency meeting discussion with . . . Preshia Cumbest, including

the name of the person having concerns and the details of what was said."   Ex. A at 134.

According to Plaintiff's deposition testimony, Ms. Cumbest guessed that it was Mr. Smith who

had questioned her abilities, which Plaintiff confirmed. Ex. A at 134-35.

Ms. Cumbest was upset and thought that the decision regarding the need for her to

perform the walk down was unfair.   Ex. G at 12.   She left her work area and went to the fuel area

where her father was working and told him about what she had learned from Plaintiff.   Ex. G at

24; Ex. C at 107-08.

Mr. Wheeless learned from the fuels team leader that Mr. Cumbest was upset about the

situation.   Ex. C at 107-08.   Until this point, Mr. Wheeless was unaware that Plaintiff had shared

the confidential details of the meeting with others.   Ex. C at 107.   Mr. Wheeless met with Ms.

---

[6] Plaintiff testified that he did not recall anyone else expressing any concern regarding Ms. Cumbest, but did not deny that that it had occurred.  Ex. A at 91.
[7] Mr. Wheeless testified that he asked Plaintiff if he was okay with that decision and that Plaintiff said he was.  Ex. C at 105.  Plaintiff testified that he did not indicate that he agreed to the decision, but that he did not voice any objection to it either.  Ex. A at 95-96.

Cumbest in an attempt to allay any concerns she may have regarding the walk down. Ex. C at 109. During that meeting, Ms. Cumbest told Mr. Wheeless that she felt singled out and she did not want Skipper Smith to think that she could not do her job because she was a girl. Ex. C at 109-10. After meeting with Mr. Wheeless, she seemed to not be as upset. Ex. C at 110.

Ms. Cumbest successfully performed the limited, two-hour walk down. Ex. G at 51-52; Ex. C at 103. Ms. Cumbest did not experience any adverse consequences from this walk down nor is there any evidence that she would have if any performance deficiencies were identified. Ex. C at 99. Ms. Cumbest testified that she did not feel that questions regarding her abilities or having to perform the walk down was a result of her gender, but that she was upset about it because she knew she was competent to perform her job and no concerns had been previously brought to her attention. Ex. G at 15-16, 42.

### 3. Subsequent Meetings Regarding Plaintiff's Breach of Confidentiality

After learning that Ms. Cumbest was aware that it was Mr. Smith who had questioned her abilities, Mr. Wheeless investigated Plaintiff's actions following the pre-consistency meeting. Ex. C at 111, 117-18. While speaking with Plaintiff regarding the situation on or about June 29, 2017, Mr. Wheeless was stunned at Plaintiff's admission that he had breached confidentiality and did so in front of the entire crew.[8] Ex. C at 117-19, 146-47 and Ex. 4 thereto. During this meeting, Plaintiff became loud and aggressive such that people in the hallway outside of Mr. Wheeless' office could hear him. Ex. C at 133. Plaintiff refused to calm down, stated he was sick of Skipper Smith, and no one liked or respected Mr. Smith. Ex. A at 140; Ex C at Ex. 3. It was clear to Mr. Wheeless that the meeting was not going to be productive and he instructed Plaintiff to go home (with pay) pending the completion of his investigation. Ex. C at 118.

---

[8] Plaintiff later testified that he had not shared the confidential information with other crew members. Ex. A at 136. However, Vicki Pierce's notes indicate that he had spoken to other crew members about her job performance. Ex. J at Ex.1 (MPC000077) thereto.

Plaintiff next reported to work on July 11, 2017.[9]  Ex. C at 141-43.  Mr. Wheeless asked Plaintiff to come to his office.  Mr. Wheeless attempted to read Plaintiff a Record of Disciplinary Action ("RODA") which set forth Plaintiff's violations, MPC's expectations going forward, and issue a one-day suspension.  Ex. C at 141; Ex. A at Ex. 9 thereto (MPC000066).  Plaintiff would not permit Mr. Wheeless to read the RODA to him.  Instead he became agitated, repeatedly interrupted him, and refused to acknowledge Mr. Wheeless' decision regarding discipline and expectations going forward.  Ex. C at 140-41 and Ex. 4 thereto. Plaintiff left Mr. Wheeless' office and instead of leaving the plant in order to begin his one day suspension, he went to Plant Manager Nik Budney's office.  Ex. C at Ex. 4.  Plaintiff admits that he was not calm, but denies that he was acting crazy, angry, or disrespectful.  Ex. A at 139. Mr. Budney testified that he was shouting, confrontational, and aggressive and that he perceived his behavior to be violent and not the type of behavior expected of a leader.  Ex. H at 10-12, 17-18, 20.  Mr. Budney asked him repeatedly to calm down, but Plaintiff did not and left the office, slamming the door.   Ex. H at 11-12.

Plaintiff never once said to Mr. Wheeless or Mr. Budney during any of these three interactions that he believed that Ms. Cumbest or Ms. Fayard were being discriminated against. Ex. C at 150, 162 and Ex. 3 thereto; Ex. H at 9-10, 19-20; and Ex. D at MPC000050-51.  Nor did Mr. Wheeless or Mr. Budney infer that Plaintiff was trying to do so.  Ex. C at 122; Ex. H at 19-20.  Indeed, Plaintiff testified:

A.     My goal and what I felt like I accomplished or tried to - - I don't know if I accomplished it or not - - that that meeting was an attempt to voice what was confirmed in my mind of - - of discriminatory treatment against Wendy and Preshia.  I felt like it was unheard.

Ex. A at 140

---

[9]     Plaintiff was on vacation and then out due to a medical issue involving his wife. Ex. C at Ex. 4 thereto.

> A.   I'm not sure what I said, but I did relay expressing a culture or a feeling and expressing the same sentiments that there's people that have a lack of trust in them.  Whether I named both or one, I- - I can't say at this moment.

Ex. A at 150.

Both Mr. Wheeless and Mr. Budney clearly testified that if Plaintiff had complained of gender discrimination, then things would have gone differently.  Ex. C at 122; Ex. H at 48-49.

After leaving Plant Daniel, Plaintiff went to MPC's main office in Gulfport where he spoke to members of the Concerns Group, specifically Ms. Vicki Pierce, Mr. Frank Dawson, and Mr. Brigham Young.  Ex. A at 110-13.  One of the responsibilities of the Concerns Group is to receive formal employee concerns and to conduct unbiased, confidential investigations into any such concerns.[10]  Ex. I at 18.  Plaintiff testified that he again attempted to express his concerns regarding the treatment of Ms. Cumbest and Ms. Fayard.  Ex. A at 110-13.  However, Plaintiff again could not testify as to what he actually said to them.  Ex. A at 111-13.   When pressed, Plaintiff stated, "I personally don't see a difference in the word, discrimination, and the word, unfair treatment."  Ex. A at 112.  "I think my goal was to express the concerns to those two women, because as I stated earlier, the - - the consistency meeting confirmed to me the targeting of those two or in my mind confirmed the targeting of those two women.  So I'm not recollecting all of the details that I may have told them."[11]  Ex. A at 113.

During the meeting, Plaintiff repeatedly made statements to the effect of "I know I'm a goner," based on the events that had just occurred.  Ex. J at 18-19.  Plaintiff said he refused to work with Hardy Wheeless and he had already called about his pension.  Ex. J at Ex. 1 thereto (MPC000081).  He admitted to breaching confidentiality and to asking his team members about

---

[10]According to Mr. Reaves, the program "is well used when people have an issue . . . I do know things that are substantiated, because if it is substantiated, then we have to correct it."  Ex. E at 27.

[11] During this time period, there was also a female on Mr. Smith's crew.  Ex. F at 22.  Notably, there has been no allegation that this employee has been mistreated.

Ms. Cumbest's work.  Ex. J at Ex. 1 thereto (MPC000077).  Mr. Dawson's notes reflect that Plaintiff generally complained of unfair treatment of Ms. Fayard and Ms. Cumbest.  Ex. K at 16 and Exs. 3 and 4 thereto.  Mr. Dawson did not perceive Plaintiff's complaints to involve any unlawful conduct.  Ex. K at 18, 39-40.  Ms. Pierce's notes to herself indicate that when she had time to think about how to go about looking into Plaintiff's complaints, she was wondering if there was an issue of gender discrimination or retaliation that needed to be investigated.  Ex. J at 30 and Ex. 1 thereto (MPC000081).

Following the meeting, Ms. Pierce contacted the Human Resources representative at Plant Daniel, Ginger Lehman, and inquired whether they were about to terminate Plaintiff.  Ex. R at 23, 27.  She instructed Ms. Lehman to keep her in the loop regarding any decisions related to Mr. Muller.  Ex. R at 23-27.  Per standard operating procedures, Ms. Pierce notified Mr. Allen Reaves (then Vice President and Senior Production Officer) that a concern had been filed by Plaintiff.   Ex. J at 34; Ex. E at 18.  Mr. Reaves was already aware of Plaintiff's behavior earlier in the day at Plant Daniel.  Ex. E at 29; Ex. J at Ex. 1 thereto (MPC000082).  Sometime afterwards, Ms. Pierce learned that the decision to terminate had been made.  She confirmed that no information regarding the complaint to the Concerns Group had been shared.  Ex. J at 40.

The group decided that Mr. Dawson would do some preliminary investigation as to whether Ms. Fayard or Ms. Cumbest had been treated unfairly.  Ex. J at 70-72.  Mr. Dawson reviewed their PPS for the last several years and spoke with the female compliance manager at Plant Daniel who was very familiar with Ms. Fayard and Ms. Cumbest and who was involved in plant leadership meetings.  Ex. K at 29, 32-33.  After Mr. Dawson's informal investigation, it

was decided that no further investigation was warranted at the time.[12]  Ex. J at 89; Ex. K at 34-35.

MPC is very careful to keep concerns confidential and separate from any human resources issues, including situations that may involve conduct that warrants discipline.  Ex. I at 29; Ex. Q at 16-17, 41-42.  In this case, it is undisputed that Mr. Wheeless did not know what any concern was about.  Ex. C at 184.  Likewise, Mr. Budney was unaware of any complaints of unlawful activity when he decided that plaintiff should be terminated.  Ex. H at 22.  Mr. Reaves testified that did not know that Plaintiff had made any complaint about gender discrimination when he concurred with Mr. Wheeless and Mr. Budney's decision on termination.    Ex. E at 25, 32.  Ms. Pierce's testimony was that Mr. Reaves was aware of the concern on July 12, 2018 – the day after Plaintiff's outbursts.  Ex. J at 41, 49.  Mr. Reaves testified unequivocally:

> Q.    I'm asking him as the person who determined that Mark Muller should be terminated whether he believes that termination decision was the right decision if, in fact, Ms. Fayard's allegations are found to be correct.
> . . .
> A.    Mark was terminated for hostile violent behaviors, for violation of confidential information, breaking trust within his team.  So, yes, he should have been terminated.

Ex. E at 54.  Mr. Reaves further testified that in his "30-plus years of experience, I do not recall conduct of that nature.  There was no comparison that I could think of – that would merit retaining his position at Mississippi Power Company . . . . It was extreme behavior."  Ex. H at 31.

---

[12] Ms. Fayard recently testified that she believed she had been subjected to discrimination and signed a declaration that was provided to her by Plaintiff stating same.  Ex. L at Ex. 3 thereto.  The Concerns Group launched a formal investigation in response to this testimony.  Ex. E at 52; Ex. M at ¶ 2.  Notably, during her interview with the Concerns Group, Ms. Fayard stated that Plaintiff's counsel had confused her and that she did not actually believe that she had been discriminated against but rather felt that she had been treated unfairly at times.  Ex. M at ¶ 3 and Ex. 1 thereto.  The union representative who was present during that interview corroborated the accuracy of Ms. Strickland's notes of this meeting.  Ex. N at 21, 23.  Ms. Fayard testified that "all of y'all [lawyers] kind of freak me out a little bit."  Ex. L at 101.

The decision to terminate Plaintiff was made by Mr. Budney and Mr. Wheeless who informed Mr. Reaves of the situation and their decision.  Ex. D at Response to Int. 10; Ex. E at 16; Ex. H at 9, 50.  In situations such as this, the employee relations department provides support and information to the decision makers, whose decision is reviewed and approved by Mr. Reaves and Mr. Anthony Wilson, President and CEO.[13]  Ex. D at Defendants' Response to Int. 10; Ex. R at 33.  Based on the events as relayed by Mr. Wheeless and Mr. Budney, Mr. Reaves agreed with the decision to terminate.  Ex. E at 16.  Prior to notifying Plaintiff of his termination, but after the decision had been made, Mr. Norman Collins, Employee Relations Manager, and Mr. Reaves had an email exchange which referenced Plaintiff's date of birth, usage of vacation, and thoughts regarding retirement.  Ex. E at 62-63; Ex. Q at 6, 35-36.  As recognized by Plaintiff's counsel:

> Q.    Can we at least agree that the substance of this email chain at MPC000397 is not directly related to the reasons that Mr. Muller was terminated?
>
> A.    It was not.  It didn't have anything to do with his termination.
>
> Q.    But it was nevertheless something discussed between you and Mr. Collins about a week after you determined to terminate him?
>
> A.    Yes.

Ex. E at 63 and Ex. 4 thereto.  The exchange was prompted by Mr. Collins' inquiry as to whether Mr. Reaves wanted to bridge Plaintiff with additional vacation in case he might want to retire at age 62 in lieu of termination.  Ex.  E at 58-63.

Although Plaintiff admittedly never articulated what he was actually complaining about and is not even sure what he said to Mr. Wheeless or Mr. Budney or the Concerns Group, he now alleges that he complained about gender discrimination on multiple occasions.  The situations which he alleges demonstrate gender discrimination against Wendy Fayard and Preshia Cumbest

---

[13] Norman Collins was not aware of any complaint of gender discrimination during the termination process.  Ex. Q at 34.

and formed the basis of his complaints involve (1) Ms. Fayard's removal from the Substitute Team Leader list, (2) a gypsum overflow which resulted in Ms. Fayard and other male members of her crew being disciplined, (3) Mr. Wheeless' response to Plaintiff permitting Ms. Fayard to sit in the control room while wearing a medically prescribed boot, and (4) Ms. Cumbest's performance of a walk down. The walk down issue is set forth above; the remaining occurrences are set forth below in chronological order.

### Wendy Fayard's Removal from the Substitute Team Leader List

The Operations department at Plant Daniel maintains a list of operators who are eligible to serve as Substitute Team Leaders when no Team Leaders are available to work due to meetings or vacations. Ex. C at 59. Ms. Fayard was on this list for a period of time until she was rated as Needs Improvement in the area of Dependability by a former Team Leader - not Hardy Wheeless - based on her usage of sick leave at mid-year and year end of 2016.[14] Ex. L at 34 and Ex. 4 thereto; Ex. C at 56.[15] Notably, Ms. Fayard did not testify that this rating was discriminatory. Ex. L at 96-97. Plaintiff was not assigned to Plant Daniel when she was removed from the list. Ex. A at 86. Plaintiff testified he does not know who made the decision to remove her or whether Mr. Wheeless was the operations manager at that time. Ex. A at 86-87.

In Spring 2017, Ms. Fayard asked to be reconsidered for the Substitute Team Leader list. Ex. C at 67. Prior to this request, Mr. Wheeless had verbally counseled her multiple times regarding her online shopping habits and cell phone usage while she was supposed to be working and for behavior that was disruptive and distracting to others in the control room. Ex. C at 68,

---

[14] Male employees have also received a Needs Improvement or Expectations Not Met rating in Dependability for the same reason. Ex. B at ¶ 6 and Ex. 3 thereto; Ex. M at Ex. 1 thereto.

[15] Ms. Fayard was rated as Needs Improvement in Dependability for her sick leave usage, prior to Mr. Wheeless' arrival at Plant Daniel, and her attendance improved for a while. Ex. C at 56, 57.

84-86.  Although Ms. Fayard's request was discussed, it is unclear as to whether a decision was made.  Ex. C at 105-06.

**The Gypsum Overflow Incident**

In October 2016, prior to Plaintiff being transferred to Plant Daniel, some members of E Crew received discipline for a gypsum overflow event.  Ex. A at 107; Ex. O at ¶¶ 2-5.  The crew was informed at the beginning of the shift that there was an issue regarding the scrubber that required their attention and for them to manually operate the equipment.  Ex. L at 106-07. However, the crew did not properly manage the situation. High level alarms were received in the control room, but were not investigated.  Ex. O at ¶ 3.  As a result, the overflow event lasted about six hours until it was detected.  Ex. O at ¶ 4.   Because the crew had been notified at the beginning of the shift of the need to monitor and handle the situation, yet failed to do so, the responsible individuals received formal discipline.  Ex. O at ¶ 5.  The individuals receiving the discipline were Wendy Fayard, Dustin Hamilton, Mark Wicks, and Adam Taylor.  Ex. O at ¶ 5. With the exception of Mr. Taylor, these individuals did not receive the full amount of their potential performance based bonus allocation as a result of their role in the situation.  Ex. L at 23; Ex. O at ¶ 5.  The remaining individuals on the crew, including Ms. Cumbest, did not receive discipline.  Ex. O at ¶ 5.

Ms. Fayard acknowledged her role in the event and stated that she would not let it happen again.  Ex. L at 106-07.  However, she did not agree with the issuance of the discipline to just a few members of the crew.  Ex. L at 24-25 and Ex. 3 thereto.  She later complained about the discipline because a subsequent event involving Mr. Smith's crew in March 2017 did not result in discipline.  Ex. L at Ex. 3 thereto.  This event was different than the spill which occurred on E Crew's watch.  This event was caused by an equipment malfunction that occurred during the

14

shift and was immediately addressed by the crew.  Ex. O at ¶ 6.  Although Plaintiff admittedly lacked personal knowledge of either event, he repeatedly raised the issue and complained that Mr. Smith's crew should have received discipline for their event, even after Mr. Wheeless provided an explanation and instructed Plaintiff to stop discussing it.  Ex. A at107; Ex. C at Ex. 3 (MPC000033) and Ex. 4 (MPC000066) thereto; Ex. R at 26.

**Wendy Fayard's Medically Prescribed Boot**

In the Spring of 2017, Wendy Fayard broke a toe and was directed to wear a boot by her physician.  Ex. C at 61; Ex. L at 43.  After being prescribed the boot, Wendy Fayard was scheduled to work the night shift.  Ms. Fayard called the on-duty Operations Team Leader, Mr. Shay Smith, to inform him that she was wearing a boot.  Ex. L at 44; Ex. C at 62.  Mr. Shay Smith called her back and instructed her to not report to work until she had a doctor's note explaining what restrictions she was under and for what length of time.  Ex. L at 44; Ex. C at 62. Ms. Fayard ignored Mr. Shay Smith's instructions and arrived at Plant Daniel for work.  Ex. L at 44-45.  Ms. Fayard contacted Mr. Russell Bush, the union representative and asked him to meet her in the parking lot.  Ex. L at 45.  Ms. Fayard arrived at Plant Daniel and she and Mr. Bush called an MPC nurse from the parking lot.  Ex. L at 45.  Plaintiff also arrived around this same time and after consulting with the MPC nurse, Plaintiff approved Ms. Fayard to sit in the control room.  Ex. L at 45.

Mr. Wheeless subsequently questioned Plaintiff regarding his decision to permit Ms. Fayard to spend her shift in the control room while wearing a boot, but not performing any meaningful work.  Ex. A at 78-79.  MPC's practice is to accommodate employees with limited mobility with productive work in an area that would not pose a threat to their safety should an evacuation be required.  Ex. C at 63, 67.  Indeed, Plant Daniel is MPC's largest electrical

generation plant in Mississippi.  Due to the inherently dangerous nature of the facility, there is a constant focus on safety and quality.  Ex. B at ¶ 2.  There is no evidence that Mr. Shay Smith or Mr. Wheeless had any intent to discriminate against Ms. Fayard by requesting that she provide the requested documentation prior to reporting for work.  Indeed, these same guidelines have been applied to males as well.  Ex. B at ¶ 7.  Further, Ms. Fayard did not suffer any adverse employment action connected to this situation.  Ex. A at 79-81.  Plaintiff testified that after meeting with Mr. Wheeless, he agreed to follow this protocol in the future and intended to do so. Ex. A at 81-83.

### D.      Plaintiff's Inactions Post-Termination

In the termination meeting, Plaintiff rejected MPC's offer to allow him to resign.  Ex. A at 164.  He stated that he wanted to work for four more years.  Ex. A at 182-83.  He also previously stated to the Concerns Group that he refused to work for Hardy Wheeless any longer and had checked on his pension.  Ex. J at Ex. 1 thereto (MPC000081).

Rather than seek unemployment compensation benefits, Plaintiff chose to apply for social security benefits and retire.  Ex. A at 186.  He has made no attempt to seek subsequent employment whatsoever, despite the fact that he has experience in many fields other than electrical generation such as  insurance, mortgage lending, or running a child care center.  Ex. A at 26, 40, 178, 186.  One of MPC's experts – who did not have the benefit of contemporaneously researching potential jobs that existed following Plaintiff's termination – identified a number of potential positions for which Plaintiff could have applied for, but simply did not.  Ex. P.

### E.      EEOC Charge

Plaintiff filed an EEOC charge in which he complained of age discrimination and retaliation for reporting unfair treatment of women at work.  Ex. B at ¶ 4 at Ex. 2 thereto.  He

submitted a packet of information in support of his claim.  In this packet, he admitted to breaking confidentiality.  See "Seven Important Facts," contained in Ex. A at Ex. 11 thereto.  The EEOC dismissed the charge on September 13, 2017, without ever notifying MPC that a charge had been filed.  Ex. B at ¶ 4.

The EEOC conducted an interview prior to Plaintiff signing the actual charge.  See PCP Interview Notes, contained in Ex. A at Ex. 11 thereto.  Plaintiff reported that he believed he was fired "because of his age and in retaliation for reporting 'unfair treatment to women' at work." See PCP Interview Notes, contained in Ex. A at Ex. 11 thereto.  He further reported that he had heard that "If you work on Skipper's crew you are the best, but if you are not, you are the worst." See PCP Interview Notes, contained in Ex. A at Ex. 11 thereto.  He also alleged that Mr. Smith spoke negatively about a white male employee. See PCP Interview Notes, contained in Ex. A at Ex. 11 thereto.  He was unable to provide any comparators who were younger, but treated more favorably.  See PCP Interview Notes, contained in Ex. A at Ex. 11 thereto

In the Pre-Determination Interview which occurred prior to dismissal of the charge, Plaintiff again could not identify any comparator with regard to his age discrimination claim. See Pre-Determination Interview, contained in Ex. A at Ex. 11 thereto.  He was also informed during that interview that retaliation must be connected to one of the EEOC bases.  See Pre-Determination Interview, contained in Ex. A at Ex. 11 thereto.

## III.    LAW AND ARGUMENT

### A.    Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Plaintiff bears the burden of proof at the summary judgment stage

263486.2

to show that Defendant's motion should not be granted.[16]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A genuine dispute of material fact means that 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).

The non-moving party may not rest upon mere allegations or denials in his pleadings but must set forth specific facts showing the existence of a genuine issue for trial.  *See Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).  He must do more than allege that he "might could" show certain facts at trial.  *Howard v. City of Greenwood*, 783 F.2d 1311, 1315-16 (5th Cir. 1986).  The evidence must not be "merely colorable" but must be "significantly probative." *Liberty Lobby*, 477 U.S. at 249.   "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir.  2003).

In this case, Defendant is entitled to summary judgment because Plaintiff cannot establish that he was discriminated against on the basis of his age or retaliated against for unlawful reasons.

---

[16] The Fifth Circuit Court of Appeals has specifically noted that the trial court should coordinate Rule 56 requirements with the allocation of the burden of proof at trial.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195-96 (5th Cir. 1986).

> If the movant . . . does not bear the burden of proof, he should be able to obtain summary judgment simply by disproving the existence of any essential element of the opposing party's claim or affirmative defense . . .   If the moving party can show that there is no evidence whatever to establish one or more essential elements of a claim on which the opposing party has the burden of proof, trial would be a bootless exercise . . . .

*Id.* at 1194-95.

**B.      Plaintiff Cannot Establish an Actionable Claim for Age Discrimination**

A plaintiff alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") may prove his claim using direct evidence or circumstantial evidence.  "[T]o qualify as direct evidence of discrimination, an employer's comment 'must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Read v. BT Alex Brown Inc.,* 72 F. App'x 112, 119 (5th Cir.2003) (quoting *EEOC v. Tex. Instruments Inc.,* 100 F.3d 1173, 1181 (5th Cir.1996)).  Stated differently, direct evidence requires a conclusion that age was the "but-for" cause of termination.

In order for comments to be considered direct evidence of age discrimination, the comments must be: "1) related to the plaintiff's age; 2) proximate in time to the plaintiff's termination; 3) made by individuals with authority over the termination decision; and 4) related to the termination decision."  *Simmons v. SAIA Motor Freight Line LLC*, 2018 WL 5992883, at *2 (5th Cir. Nov. 14, 2018).  Plaintiff's counsel and Mr. Reaves agreed that the emails did not relate to the termination decision.  Ex. E at 63.

A plaintiff may also prove an age discrimination claim based on circumstantial evidence.

[A] plaintiff alleging age discrimination who does not have direct evidence of discrimination must put forward a prima facie case that: (1) she was fired; (2) she was qualified for the position; (3) she was within the protected class; and (4) she was either (a) "replaced by someone outside the protected class," (b) "replaced by someone younger," or (c) "otherwise discharged because of [her] age." *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007). If the ADEA plaintiff makes a prima facie case, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Id*. "If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Moss*, 610 F.3d at 922.

*Benjamin v. Felder Services LLC*, 2018 WL 6119903, at *2 (5th Cir. Nov. 20, 2018).

Pretext is established by showing evidence of disparate treatment or that the explanation is false or unworthy of credence. *Id*. at *3. Regardless of whether a plaintiff attempts to establish his case using direct or indirect evidence, he must ultimately prove by a preponderance of the evidence that age discrimination was the "but-for" reason for his termination. *Id*. at *2 (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)).

Plaintiff can prove a prima facie case of age discrimination using circumstantial evidence because he was replaced by someone outside of the protected class. Ex. H at 22-23. However, he cannot overcome MPC's legitimate, non-discriminatory reason for terminating him. While Plaintiff initially was going to be disciplined for the breach of confidentiality, his subsequent outbursts and insubordinate conduct constitute MPC's legitimate non-discriminatory reasons for his termination. Ex. E at 54; Ex. H at 15, 17-18. Plaintiff cannot establish that these reasons are pretext for age discrimination and that his age was the "but-for" reason for his termination. While age related comments can be used to show pretext, to be considered relevant evidence, as part of a broader circumstantial case, workplace comments "must show: '(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.' " *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015) (citing *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015)).

Here, the only "evidence" related to Plaintiff's age are a few emails between Mr. Norman Collins and Mr. Allen Reaves, neither of which were the actual decision makers. Ex. D at Defendants' Response to Int. 10. As both explained and acknowledged by Plaintiff's counsel, the information was shared after the decision to terminate Plaintiff was made and as part of Mr. Collins' normal practice to provide information that may be important in formulating a potential

severance package.  Ex. E at 58-63; Ex. Q at 35-37.   The e-mail communications in question do

not show discriminatory animus and do not show pretext.  There is no evidence of any age based

animus or statements made by Mr. Wheeless or Mr. Budney.  Indeed, Mr. Reaves, Mr. Wheeless

and several of Operations Team Leaders at the time were close in age to Plaintiff.  Ex. B at ¶ 8;

Ex. O at ¶ 1.

### C.    Plaintiff Cannot Establish Unlawful Retaliation

Title VII does not provide protection to employees for any and all complaints they make.

It limits protection to only complaints of unlawful conduct, not lawful conduct which is deemed

unfair, frustrating or oppressive.   *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d

276 (2d Cir. 1998) (plaintiff's opposition to doing personal work for supervisor was not an

objection to any alleged sexual discrimination or harassment, so it was not a protected activity);

*Foster v. Humane Soc'y of Rochester & Monroe Cnty.*, 2010 WL 2867325 (W.D.N.Y. July 21,

2010) (retaliation claim dismissed where plaintiff complained of problems she was having at

work unrelated to discrimination, even though she used the phrase "hostile work environment");

*Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons*, 999 F. Supp. 506 (S.D.N.Y. 1998)

(plaintiff's casual and vague remark to supervisor that suggested she felt discriminated against

by her colleague receiving a promotion was not protected activity).  Further, Section 704 of Title

VII provides protection only for complaints that qualify as "opposition" or "participation" as a

matter of law.[17]  "Protected activities consist of (1) opposing any practice deemed an unlawful

employment practice by [T]itle VII (the "opposition clause") or (2) making a charge, testifying,

assisting, or participating in any manner in an investigation, proceeding, or hearing under [T]itle

---

[17]  The retaliation provisions of Title VII state: "It shall be an unlawful employment practice for an
employer to discriminate against any of his employees ... because he has opposed any practice made an
unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. §
2000e–3(a).

VII (the "participation clause")." *Ellis v. Compass Group USA, Inc.*, 426 Fed. App'x 292, 296 (5th Cir. 2011); *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372–73 (5th Cir.1998).  Plaintiff has no valid claim under either the participation clause or the opposition clause.

Plaintiff alleges that he was retaliated against after complaining about the treatment of two employees first to Mr. Wheeless, then to Mr. Budney, and then to the Concerns Group. However, as shown below, he cannot establish the elements of his claim.

In order to defeat summary judgment on his retaliation claim, Plaintiff must establish that "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (per curiam).

### a.    Protected activity

Plaintiff was terminated prior to the filing of his EEOC charge, so he has no claim under the participation clause. *See EEOC v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1174 n. 2 (11th Cir. 2000) (participation clause only protects an employee's activities that "occur in conjunction with or after the filing of a formal charge with the EEOC," not an employee's participation "in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC"); *Aldridge v. Tougaloo College*, 847 F. Supp. 480, 483 (S.D. Miss. 1994) ("Since [plaintiff] had not instigated any proceedings herself, and did not testify, assist, or participate in an EEOC investigation, her allegations cannot fall under the participation clause"); *Dear v. Jackson State Univ.*, 2008 WL 4225766 (S.D. Miss. 2008) ("participation clause affords protection only when the claimant made a claim, or participated in an investigation, proceeding, or hearing, under Title VII").

An employee engages in protected activity when he opposes employment practices made unlawful by Title VII.  However, Plaintiff's claim that he opposed unlawful practices fails for a number of reasons.  First, "[c]omplaints to employers that do not complain of conduct protected by Title VII do not constitute protected activities under the statute."  *Saucier v. Miss. Dept. of Corrections*, 2014 WL 6750454, at *3 (S.D. Miss. Dec. 1, 2014) (internal quotations omitted). Second, an employee must have a reasonable belief that the complained of actions were a violation of Title VII.  *See Taliaferro v. Lone Star Implementation & Elec. Corp.*, 693 Fed. App'x 307, 310 (5th Cir. 2017) ("[Plaintiff] need not prove that the conduct she opposed rose to the level of a Title VII violation, but she 'must at least show a reasonable belief that it did.'"). Courts measure a plaintiff's belief that an employer engaged in an unlawful employment against the substantive law.  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).   As explained in *Howard*,

> Even if Howard subjectively believed that Krzastek unlawfully discriminated against him when he left a message stating that Howard's job was in jeopardy, his belief could not have been objectively reasonable.  A discrimination claim under Title VII requires an adverse employment action.  Not all employer actions that negatively impact an employee qualify as "adverse employment actions."  Rather, only those employment actions that result in "a *serious and material* change in terms, conditions, or privileges of employment" will suffice.

*Id*. at 1245 (emphasis in original) (internal citations omitted).

Third, generalized complaints that do not specifically refer to an unlawful practice or at least put the employer on notice that the employee is complaining of an unlawful practice are not protected activity.  *Everett v. Central Mississippi, Inc. Head Start Program*, 444 Fed. App'x 38, 46 (5th Cir. 2011) (per curiam) (plaintiff who disputed the basis for various disciplinary actions but did not complain that it was due to sex, race, age or other protected class did not engage in protected activity).

"While an employee is not expected to use precise legal terms," he must at least "put his employer on notice that his complaint was based on discrimination." *Wright v. Custom Ecology, Inc.*, No. 3:11CV760 DPJ FKB, 2013 WL 1703738, at *8 (S.D.Miss. Apr. 19, 2013) (citing *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 396 (5th Cir.2008) (finding no protected activity because plaintiff's complaint of unfair treatment never referred to the discriminatory treatment as age-based)); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir.2007) (affirming summary judgment on retaliation claim where the plaintiff's email focused on a workplace incident and "the deteriorating relationship" between the plaintiff and her supervisor and did not mention race); *Harris Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir.2006) (holding that plaintiff did not engage in protected activity when she never "mentioned that she felt she was being treated unfairly due to her race or sex").

*Woods v. Best Buy Stores, L.P.*, 2015 WL 5970813, at *5 (S.D. Miss. Oct. 14, 2015).

Here, Plaintiff admits that he never complained of "gender discrimination" to Mr. Wheeless or Mr. Budney, the decision makers in this case. He testified that he wasn't sure what he said or that he succeeded in conveying his concerns. Ex. A at 140, 150. Regardless of what Plaintiff intended, it is clear that he did not engage in protected activity with regard to Mr. Wheeless or Mr. Budney. *Tratree v. BP North American Pipelines, Inc.*, 277 Fed. App'x 390, 395 (5th Cir. 2008) ("Complaining about unfair treatment without specifying why the treatment is unfair, however, is not protected activity."); *Davis v. Dallas Ind. Sch. Dist.*, 448 Fed. App'x 485, 493 (5th Cir. 2011) (per curiam) ("We have consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity."). The information gathered by the EEOC did not indicate that Plaintiff had engaged in a protected activity, although the documents are replete with references to "unfair treatment."

Moreover, even if Plaintiff had been clear that he was complaining about gender discrimination, he could not have had a reasonable belief that the situations about which he was complaining were unlawful.

(1)   Ms. Cumbest's walk down was based on the concern that she had some gaps in her knowledge which is a legitimate, non-discriminatory reason. She successfully completed the walk down and there is absolutely no admissible evidence that she could have suffered any adverse employment action if she had not.

(2)   The situation involving Ms. Fayard working with a boot without providing the requested information also does not have any gender implications. This requirement is applied across the board due to the safety concerns regarding an employee's ability to be able to react in the event of an emergency. Multiple male employees conformed to this requirement during 2015 through 2017. Ms. Fayard was not adversely impacted by this situation.

(3)   The discipline that was given to certain individuals of E Crew as a result of the gypsum overflow could not have been based on gender. Males and a female received the discipline, while other males and a female member of the crew did not. Ms. Fayard accepted responsibility for her involvement. The subsequent event involving Mr. Smith's crew is easily distinguished and is not a proper comparison.

(4)   Ms. Fayard's removal from the Substitute Team Leader list was not based on her gender. She was removed in 2016 because of her Dependability rating based on her attendance, which is a legitimate, non-discriminatory reason. Males received similar ratings for similar reasons. She was not reinstated when requested in early 2017 as no decision was ultimately made at that time.

Finally, engaging in protected activity does not excuse an employee from complying with work rules or job requirements. *Smith v. Home Depot U.S.A., Inc*., 2007 WL 4292572, at *6

263486.2

(S.D. Miss. Dec. 5, 2007).   "[N]ot all activity purportedly done in opposition to perceived unlawful employment practices is protected by the opposition clause…[T]here are instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed, which conduct is not protected… [T]he opposition clause was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." *Smith v. Tex. Dep't of Water Resources*, 818 F.2d 363, 366 (5th Cir. 1987) (internal citations omitted).   In order to be protected, the employee's conduct "must be reasonable in light of the circumstances and must not be unjustifiably detrimental to the employer's interest." *Zeigler v. Univ. of Miss. Med. Ctr.*, 877 F. Supp. 2d 454, 461 (S.D. Miss. 2012) (internal quotations omitted).

Here, Plaintiff's behavior was so inconsistent with his position of leadership that he was sent home after his outbursts on two occasions.   He refused to calm down when requested and continued his tirades until he was sent home.   He has not identified a single comparator who engaged in similar behavior, but was not fired who was either younger than him or who allegedly opposed unlawful employment practices.

### b.   Causation

With regard to the causation requirement, Plaintiff must present evidence that the decision makers were aware of any protected conduct. *Taylor v. Marshall Durbin Food Corp.*, 37 Fed. App'x 89 (5th Cir. 2002) (per curiam).   This he cannot do.   However, it should also be noted that knowledge does not necessarily establish causation either.   While close timing between the adverse employment action and alleged protected activity can establish the prima facie case, the employee must still establish that the protected activity was the but-for cause of the adverse employment action.   *Cobb v. Singing River Health System*, 2012 WL 1155246, at *3 (S.D. Miss. April 5, 2012), *aff'd* 503 Fed. App'x 290 (5th Cir. 2012).

Mr. Wheeless and Mr. Budney were the decision makers with regard to Plaintiff's termination. It is undisputed that neither was aware of any complaint of unlawful activity by Plaintiff. At most, for purposes of summary judgment, there is evidence that indicates Mr. Budney and Mr. Wheeless were aware at some point that Plaintiff had spoken with the Concerns Group, but did not know the content of his communications with the group or the basis of his complaints. Even if these individuals assumed that the call to Ms. Lehman meant that Mr. Muller had filed a concern, it does not necessarily establish that they were aware he had engaged in any legally protected activity. Mr. Budney and Mr. Wheeless briefed Mr. Reaves on the confidentiality issue and Plaintiff's outbursts and he concurred with the decision to terminate. Although Mr. Reaves may have become aware of the substance of Plaintiff's complaint to the Concerns Group, he clearly testified that he did not know of any complaints when he made the decision that termination was in order. He also clearly testified that even if he had known the details of any complaints, he would have made the same decision based on Plaintiff's extreme and disruptive behaviors.

### c. MPC's legitimate non-discriminatory reasons for Plaintiff's termination

Assuming for the sake of argument that Plaintiff could make a prima facie showing, MPC is still entitled to summary judgment under the *McDonnell Douglas* burden-shifting framework. Under the *McDonnell Douglas* burden-shifting paradigm, if a plaintiff establishes a prima facie case, the employer is allowed to show legitimate nonretaliatory reasons for the adverse action. *Septimus v. Univ. of Houston*, 399 F.3d 601, 607–08 (5th Cir. 2005). Upon meeting that burden, the plaintiff must then show that the nonretaliatory reason was a pretext and that the adverse employment action would not have been taken "but-for" the employee engaging in a protected activity. *Univ. of Texas SW. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013); *Septimus*, 399 F.3d at

608. Pursuant to this heightened standard, temporal proximity alone is not sufficient to establish causation. *Hernandez v. Metro. Transit Authority of Harris Cnty.*, 673 Fed. App'x 414, 420 (5th Cir. 2016). *See also Cobb*, 2012 WL 1155246, at *3 (if the plaintiff cannot come forward with any evidence other than close timing between the alleged retaliation and the alleged retaliatory action to rebut the legitimate non-discriminatory reason, then summary judgment is appropriate).

In summary, it is clear that Plaintiff did not engage in any protected activity.  He did not complain to the decision makers about any unlawful conduct.  Even if his complaints could be construed as being about gender discrimination, none of the conduct about which he complains constitutes gender discrimination.  The record evidence is clear that Plaintiff was terminated as a result of his behavior.  Plaintiff admits that he did confirm Ms. Cumbest's statement that it was Skipper Smith who questioned Ms. Cumbest's capabilities.  Plaintiff's behavior during the meeting was insubordinate, hostile, and not the type of behavior that MPC expects of its employees, especially its supervisors.[18]  Plaintiff has not identified a single comparator who engaged in substantially similar behavior, likely because as Mr. Reaves testified there are no comparators who engaged in such extreme behavior.

However, even if MPC incorrectly determined that Mr. Muller breached confidentiality and that his subsequent actions were insubordinate and/or grounds for termination, it does not follow that MPC retaliated against him.  Courts are not to second guess employment decisions.  "[E]mployers are not required to make proper decisions, only non-discriminatory ones." *Cobb v. Singing River Health System*, 2012 WL 1155246, at *4 (S.D. Miss. April 5, 2012) (citation omitted). Importantly, Plaintiff's subjective belief that his actions with regard to Mr. Wheeless

---

[18]     Mr. Wheeless and Mr. Budney's testimony on this point corroborate each other's interpretation of Mr. Muller's behavior and there are no witnesses to the meetings.  Mr. Reaves testified that was his understanding of the events as well.

and Mr. Budney were not insubordinate is not sufficient to create an inference of discrimination. *Stallworth v. Singing River Health System*, 469 Fed. App'x 369, 372 (S.D. Miss. 2012).

### D.   Plaintiff is Not Entitled to Damages

#### 1.   Plaintiff Failed to Mitigate his Damages

Title VII and ADEA plaintiffs require a plaintiff to use reasonable efforts to mitigate their damages by seeking substantially equivalent employment.  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003), *abrogated on other grounds by Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009); *Sellers v. Delgado Cmty. Coll.*, 902 F.2d 1189 (5th Cir. 1990).  The burden of proof generally lies with the defendant employer to prove that substantially equivalent work was available and the plaintiff did not seek substantially equivalent employment with reasonable diligence.  *Id*.  However, "once the employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment."  *Id*. (*quoting Sellers*, 902 F.2d 1139).  Simply put, when a plaintiff makes no effort to look for a job, he is not entitled to back pay.  *Id*.  *See also Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578-79, 1579 n.3 (5th Cir. 1989).  Similarly, a plaintiff's failure to mitigate usually will reduce or eliminate any potential front pay award.  *Hansard v. Pepsi-Cola Metropolitan Bottling Co., Inc.*, 865 F2d 1461, 1470 (5th Cir. 1989); *Lopez v. City of Biloxi*, 2006 WL 839523, at *8 (S.D. Miss. March 29, 2006) (denying front pay to plaintiff who failed to mitigate his damages because he did not diligently seek other employment or remain gainfully employed).

Here, Plaintiff admittedly failed to mitigate his damages.  He has made no effort whatsoever to seek subsequent employment.  Indeed, he did not even file for unemployment benefits because he made the decision that he was not going to look for work.  MPC's vocational

expert determined that there were substantially similar jobs available.  As such, in the event that this case proceeds to trial, MPC is entitled to a determination that Plaintiff failed to mitigate his damages and is not entitled to back pay or front pay.

### 2.      Plaintiff Has Not Established Compensable Emotional Distress

Even where liability is found, compensatory damages are not automatically awarded. *Miller v. Raytheon Co.*, 716 F.3d 138, 147 (5th Cir. 2013).  Damages related to emotional distress "must be supported by specific evidence of the nature and extent of the harm." *Id*. (citation omitted).  Medical or psychological evidence may be presented. *Id*.  However, "[a] plaintiff's conclusory statements that he suffered emotional harm are insufficient." *Id*.  In Miller, the court held that Miller's testimony that "he suffered chest pain, back pain, sleep disturbances, he also admitted that he did not take any over-the-counter pain or sleep medication.  Nor did Miller seek the assistance of any health care professional or counselor." *Id*.

In this case, when asked what damages he was claiming for emotional distress, Plaintiff testified that he did not have any idea of how much he was claiming, but "would hope it would be maximum allowed under the law."  Ex. A at 180.  His testimony reveals that is legally insufficient to support any award for emotional distress damages.  Ex. A at 151-52.  Plaintiff's written discovery response states that he "[s]uffered acute stress, inability to sleep, and worry regarding how to care for himself and his family after a traumatic and adverse financial event."  Ex. D Plaintiff's Response to Int. 11.  He has not sought any medical treatment or taken any medications for his alleged symptoms.  Ex. D Plaintiff's Response to Int. 12.  He claims he has consulted religious clergy approximately 20 times since his termination, but he refused to testify about these consultations in his deposition, claiming that he would not discuss anything relating to spiritual matters.   Ex. D at Plaintiff's Response to Int. 11; Ex. A at 160.

263486.2

Plaintiff's has not established with specific evidence the nature and the extent of the harm he claims to have suffered.  His testimony is self-serving and conclusory in nature.  Moreover, if his termination were such an adverse financial event, it makes no sense that he would forego unemployment benefits and not even attempt to find another job.  In the event that this case proceeds to trial, MPC is entitled to a determination that Plaintiff is not entitled to compensatory damages for emotional distress.

**IV.    <u>CONCLUSION</u>**

Based on the foregoing, it is clear that Mississippi Power Company has shown that it is entitled to summary judgment on Plaintiff's claims of age discrimination and retaliation.  Accordingly, Mississippi Power Company respectfully requests that this Court dismiss Plaintiff's claims entirely, with prejudice, taxing to Plaintiff all costs of the action, and awarding Mississippi Power Company such other and further relief as may be proper.  Alternatively, in the event that this case proceeds to trial, Mississippi Power Company requests that this Court find that Plaintiff failed to mitigate his damages and is not entitled to back pay or front pay or damages for emotional distress.

Submitted this 4th day of February, 2019.

**MISSISSIPPI POWER COMPANY**

By:  _s/ *Ashley Eley Cannady*_____
ASHLEY ELEY CANNADY (MSB# 101253)
ARMIN J. MOELLER, JR. (MSB# 3399)
Balch & Bingham LLP
188 East Capitol Street, Suite 1400
Jackson, MS  39201-2608
Telephone: (601) 961-9900
Facsimile: (888) 954-5405
amoeller@balch.com
acannady@balch.com

31

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned counsel, do hereby certify that on February 4, 2019, I have electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

Chadwick M. Welch
C. Maison Heidelberg
WATSON HEIDELBERG PLLC
2829 Lakeland Drive, Suite 1502
Flowood, Mississippi  39232

s/ *Ashley Eley Cannady*
Ashley Eley Cannady

263486.2